BOCA RATON
BOSTON
LONDON
LOS ANGELES
NEW ORLEANS
NEWARK
PARIS
SÃO PAULO
WASHINGTON

1585 Broadway
New York, NY  10036-8299
Telephone 212.969.3000
Fax 212.969.2900

# PROSKAUER ROSE LLP

**Elise M. Bloom**
Member of the Firm

Direct Dial 212.969.3410
ebloom@proskauer.com

January 25, 2008

**By ECF and Overnight Mail**

The Honorable Victor Marrero, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street, Room 660
New York, New York 10007

      Re:    Garcia v. The Coca-Cola Company
             Civil Action No. 07-11444(VM)

Dear Judge Marrero:

This letter is submitted on behalf of defendant The Coca-Cola Company ("Coca-Cola") in the above-referenced matter. We submit this letter in response to Your Honor's Order dated January 4, 2008 seeking the parties' position regarding the transfer of this matter to another venue. In his complaint, plaintiff Jose Leonard Romero Garcia ("Garcia"), a Guatemalan citizen, alleges that his former employer, a Guatemalan business entity, violated the terms of an employment agreement created under Guatemalan law. Despite any meaningful connection between the United States and these claims, Garcia filed suit in the State of New York. As explained below, Garcia's forum choice was motivated solely by improper forum-shopping considerations. Indeed, he has a similar action pending in Guatemala. The most convenient forum is clearly Guatemala and, accordingly, the Court should dismiss this action under the doctrine of *forum non conveniens* instead of transferring it to another United States District Court pursuant to 28 U.S.C. § 1404(a).

**Background:**  Garcia, a Guatemalan citizen, is a former employee of Compania Servicios del Distrito Norte ("CSDN"), a Guatemalan subsidiary of Coca-Cola. (*See* Exhibit A.) Garcia held the position of Assistant Director, Central America from August 1999 until his dismissal in June 2007. As Assistant Director, Garcia was responsible for servicing Coca-Cola bottler agreements in Central America, including Guatemala, and reported directly to CSDN personnel located in Mexico, not Florida. In June 2007, Garcia was provided fifteen (15) days notice of his discharge due to poor performance and issued full termination indemnity (i.e., severance) in accordance with Guatemalan law. Garcia rejected CSDN's severance offer and payment was deposited with

PROSKAUER ROSE LLP

The Honorable Victor Marrero, U.S.D.J.
January 25, 2008
Page 2

the Guatemalan Treasury Agency.  On August 17, 2007, Garcia accepted and withdrew these moneys.

On November 30, 2007, Garcia filed the instant litigation in the Supreme Court of the State of New York against Coca-Cola, a Delaware corporation with its principle place of business in Atlanta, Georgia, seeking damages arising from the termination of his employment with CSDN. Shortly thereafter, on December 17, 2007, Garcia also filed a claim with the Guatemalan labor court against Coca-Cola and CSDN also seeking damages allegedly arising from his termination of employment.  (See Exhibit B.)[1]  Because it is undisputed that the most convenient forum for this litigation is Guatemala and not this District or the Districts of Florida or Georgia, Garcia's complaint should be dismissed on *forum non conveniens* grounds.

**Plaintiff's Complaint Should Be Dismissed:**  Both the doctrine of *forum non conveniens* and Section 1404(a), permit a court, in its discretion, to "resist imposition upon its jurisdiction," even though jurisdiction may be lawfully exercised and venue technically proper, where the convenience of the parties and the interests of justice favor dismissal. See 28 U.S.C. § 1404(a); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947) (doctrine of *forum non conveniens*); Murry v. British Broadcasting Corp., 81 F.3d 287, 290 (2d Cir. 1996) (same).  When the most convenient forum is another federal district court the lawsuit may be transferred under Section 1404(a), and when the most convenient forum is a foreign country, as is the case here, the court may dismiss the lawsuit on *forum non conveniens* grounds.  See American Dredging Co. v. Miller, 510 U.S. 443, 449 n. 2 (1994) (holding that as consequence of Section 1404(a), doctrine of *forum non conveniens* has continuing application only in cases in which alternative forum is abroad).

In analyzing a dismissal on *forum non conveniens* grounds, a court must determine the degree of deference to give the plaintiff's choice of forum, decide whether an adequate alternative forum exists, and balance the private-interest factors relating to the convenience of the litigants and pubic-interest factors relating to the convenience of the forum and the ends of justice.  See Gilbert, 330 U.S. at 506-509; Iragorrie v. United Technologies Corp., 274 F.3d 65, 73 (2d Cir. 2001) (*en banc*).  Similar considerations are used in Section 1404(a) determinations.

Each of these considerations weighs in favor of dismissing Garcia's complaint.  Garcia's choice of forum must be afforded minimal deference because he is a Guatemalan citizen and his lawsuit lacks a bona fide connection the United States and to the forum choice.  Piper Aircraft Co. v. Reyno, 454 U.S. 235, 256 (1981) ("Because the central purpose of any forum *non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference").  Moreover, Garcia has already commenced an action in Guatemala against Coca-Cola and CSDN seeking damages allegedly arising from his termination.  In that case, the

---

[1] Attached as Exhibit B is a true and accurate copy of the court documents Garcia filed with the Guatemalan labor court, which are in Spanish.  Coca-Cola is in the process of getting an official translation of these pleadings and will provide a copy of this translation to this Court as soon as possible.

PROSKAUER ROSE LLP

The Honorable Victor Marrero, U.S.D.J.
January 25, 2008
Page 3

first hearing for the trial is already scheduled for May 5, 2008, and a temporary injunction was issued, making Guatemala, not a federal district court, the adequate alternative forum for adjudication of Garcia's claims.

Further, the majority of events discussed in the Complaint, including the formation of Garcia's employment contract, the alleged unlawful conduct of Coca-Cola and services allegedly provided by Garcia, took place in Guatemala and other parts of Central America. Moreover, the parties and all of the key witnesses reside in Guatemala or neighboring countries and all the potentially relevant information was communicated in Spanish, has a nexus with Guatemala and in no way touches New York or the United States. Because this Court (and any other federal district court) has virtually no interest in resolving this foreign dispute, the Court should dismiss the Complaint on *forum non conveniens* grounds.

In his response, Garcia alleges only one reason for this Court to retain jurisdiction over his claims – that he has already retained counsel in New York and to retain new counsel would be a substantial inconvenience to him. The convenience of Garcia's attorney, without more, is inconsequential to determining whether this Court should transfer or dismiss this litigation. Kolko v. Holiday Inns, Inc., 672 F. Supp. 713, 715 (S.D.N.Y. 1987) ("The convenience of plaintiff's attorney, without more, is not decisive in determining whether to grant or deny a transfer motion."). Moreover, in assessing the convenience of the parties, "the court is required to consider the convenience of *all* parties, and … the court acts for the benefit of *all*, not on behalf of the [plaintiff]." Burlington Inds., Inc. v. Salem Intern. Co., 645 F. Supp. 872 (S.D.N.Y. 1986) (emphasis added). Indeed, Garcia himself has tacitly acknowledged that Guatemala is the more convenient forum by filing suit there. As noted, Garcia already has a pending action in Guatemala against Coca-Cola seeking similar damages, and it would be an injustice for this Court to require Coca-Cola to fight the same or similar lawsuits on two fronts. Furthermore, contrary to Garcia's allegations, his claims have no connection with the State of Florida as he did not report to Coca-Cola's Florida offices during his employment with CSDN. Dismissal of Garcia's litigation at this time strikes the appropriate balance of conveniences.

In the event, this litigation is transferred instead of dismissed, the Court should transfer it to the Northern District of Georgia because that is the only district with some type of connection to Garcia's lawsuit. Specifically, Coca-Cola is headquartered in Atlanta, and to the extent any documentation in the United States exists, it would be in Atlanta.

Respectfully submitted,

/s/ Elise M. Bloom

Elise M. Bloom

cc:    Kenneth McCallion, Esq. (ECF and Overnight Mail)

# EXHIBIT A

08/23/99  13:53  ☎502 637 1209     JOSE ROMERO                          002
JUL. 12. 1999  5:45PM   COMP PLNG & DEV.                        NO. 2491  P. 1

# *Coca-Cola Interamerican Corporation*

### Central America & Caribbean
### Division
### Human Resources Department

Telephone (506) 299-3312
Fax. (506) 223-3808

P.O. Box 2749-1000
San Jose, Costa Rica

July 9, 1999

Mr. Jose Romero
Guatemala

Dear Jose:

We are pleased to confirm our offer, to join Compania Servicios del Distrito Norte, in the position of Assistant Director, Central America. This offer is conditional on the close of the Coca-Cola/Cadbury Schweppes beverage business. Your employment with The Coca-Cola Company would begin on the next business day following the close of such transaction.

Your compensation package will include an annual base salary of Q624,036 which corresponds to thirteen salaries. In addition you will be covered under Medical and Life Insurance Policies. Our on-site health services (gym, sauna, medical services, and cafeteria) will also be available to you. After three months you will be eligible to participate in the Coca-Cola Interamerican Solidarity Association.

Additionally, you are eligible to receive Supplemental Transition Payments. A schedule of these payments as well as related guidelines are attached.

We are very excited about your decision to join our team and look forward to the contributions you will make to our business.

Sincerely,

Acceptance by

EXHIBIT B

**ORGANISMO JUDICIAL**
Guatemala, C. A.

## JUZGADO SEGUNDO DE TRABAJO Y PREVISION SOCIAL

ORDINARIO No. 01089-2007-03307 Of. 1ª.

En la ciudad de Guatemala, el _____ *once* _____ de enero de dos mil ocho, a las _____ *diez* _____ horas con _____ *cincuenta y dos* _____ minutos, en AVENIDA LAS AMERICAS DIECIOCHO GUION OCHENTA Y UNO ZONA CATORCE, EDIFICIO COLUMBUS CENTER, NIVEL ONCE, OFICINA ONCE NORTE notifique a: COMPAÑÍA DE SERVICIOS DE DISTRITO NORTE, SOCIEDAD ANONIMA, la(s) resolución(es) de fecha(s): veinte de diciembre, veintiocho de diciembre de dos mil siete y siete de enero de dos mil ocho, acompaño copia de demanda, memoriales y documentos adjuntos por medio de cédula, que entregue a: _____ *Ofelia Moral* _____ _____ quien de enterado(a) _____ *si* _____ firmó. DOY FE.



**SEÑOR JUEZ DE PRIMERA INSTANCIA DE TRABAJO Y PREVISIÓN SOCIAL.**

<u>Juicio Ordinario Laboral Nuevo</u>

**José Leonardo Romero García**, de 51 años, casado, guatemalteco, Ejecutivo, de este domicilio y vecindad, ante usted respetuosamente comparezco y,

## I. EXPONGO

1. <u>**Asesoría bajo la que actúo.**</u>

   Actúo bajo la asesoría de los Abogados **Marcos Palma Villagrán**, **Juan Rafael Sánchez Cortés** y **Fernando José Zachrisson Castillo**, quienes podrán actuar en el presente asunto en forma conjunta o separada, indistintamente.

2. <u>**Lugar para recibir notificaciones.**</u>

   Señalo como lugar para recibir notificaciones, la oficina profesional de mis Abogados Asesores, situada en la **2ª calle 8-01 zona 14 Edificio Las Conchas, tercer nivel, oficina 302, de esta ciudad.**

3. <u>**Razón de mi gestión.**</u>

   Comparezco con el objeto de promover **Juicio Ordinario Laboral** en contra de:

   3.1. **The Coca-Cola Company** (en adelante la Compañía Coca-Cola), quien por su naturaleza jurídica carece de residencia, pero puede ser notificada en:

   *One Coca-Cola Plaza*

   *Atlanta, Georgia 30301*

   *Estados Unidos de América*; y

   3.2. **Compañía de Servicios del Distrito Norte, Sociedad Anónima** (en adelante la Subsidiaria en Guatemala de la Compañía Coca-Cola), quien por su naturaleza jurídica carece de residencia, pero puede ser notificada en:

   *Avenida de las Américas 18-81 zona 14*

*Edificio Columbus Center, Nivel 11, Oficina 11 Norte*

*Guatemala Ciudad.*

## II. HECHOS

1. <u>Primera Relación Laboral con la Compañía Coca-Cola.</u>

   El 1 de mayo de 1988 inicié mi primera relación laboral con la Compañía Coca-Cola (en adelante la Primera Relación Laboral), al haber sido contratado por su compañía subsidiaria en Costa Rica, Coca-Cola Interamerican Corporation (Sucursal Costa Rica), como Gerente de País para Honduras. Durante la Primera Relación Laboral, la Compañía Coca-Cola me pagó por vez primera en Febrero de 1992, un Premio Incentivo Anual -el cual era otorgado a un selecto grupo de ejecutivos de la Compañía Coca-Cola-[1], correspondiente al año 1991. Dicho pago fue por la suma de COL$560,203 -Colones Costarricenses-, equivalentes en ese entonces a US$4,045 -Dólares de los Estados Unidos de América-[2].

2. <u>Segunda Relación Laboral con la Compañía Coca-Cola.</u>

   2.1. El 8 de junio de 1992, inicié relación laboral con Cadbury Beverages Latin America (en adelante la Compañía Cadbury), como Gerente de Operaciones para Centroamérica.[3]

   2.2. Como consecuencia que la Compañía Coca-Cola compró las marcas de bebidas gaseosas Cadbury Schweppes, inicié -otra vez- relación laboral con la Compañía Coca-Cola en Agosto de 1999 (en adelante la Segunda Relación Laboral), al haber sido contratado por la Subsidiaria en Guatemala de la Compañía Coca-Cola -Compañía de Servicios del Distrito Norte, S. A.-, como Asistente del Director para Centroamérica. Mi tiempo de servicio con la

   ---

   [1] Ver Documento 1.1
   [2] Ver Documento 1.2
   [3] Ver Documento 2.1.1



Compañía Cadbury sería reconocido por la Compañía Coca-Cola, para efectos

de indemnización por tiempo servido.[4]

3.  **Paquete de compensación con la Compañía Coca-Cola.**

El paquete de compensación o remuneración por prestar mis servicios a la Compañía

Coca-Cola se componía de[5]:

3.1.  Un salario base anual que correspondía a 13 ~~salarios mensuales~~ (incluyendo

aguinaldo). Adicionalmente, en cumplimiento del Decreto 42-92 del Congreso de

la República, la Compañía Coca-Cola me pagaba un salario más, en concepto

de bonificación-anual.

3.2.  Beneficios que incluían:

➤  Seguro de salud, dental y de vida.

➤  Vacaciones

➤  Asuetos

3.3.  Premio Incentivo Anual otorgado por la Compañía Coca-Cola a empleados de

cierto nivel gerencial (de nivel 10 en adelante)[6], con base en el desempeño de la

Compañía Coca-Cola y la contribución individual del empleado a ese

desempeño. Los objetivos del Premio Incentivo Anual se basaban en el grado o

nivel salarial del gerente y eran consistentes a nivel mundial.

3.4.  Carro de la Compañía: al inicio de la relación laboral con la Compañía Cadbury,

ésta me asignó un carro de su propiedad, para uso laboral y personal. Los

---

[4] Ver Documentos 2.2.1, 2.2.2, 2.2.3 y 2.2.4

[5] Ver Documentos 3.1, 3.2 y 3.3

[6] Los niveles o grados equivalen a los distintos rangos salariales dentro de la Compañía Coca-Cola, en forma ascendente. Por ejemplo, los niveles del 1 al 6 equivalen a los rangos salariales más bajos y comprenden las posiciones de operarios, secretarias y asistentes de bajo nivel. Los niveles del 7 al 11 equivalen a los rangos salariales intermedios y comprenden las posiciones de gerentes junior, asistentes del director y gerentes de marca. Los niveles del 12 al 16 equivalen a los rangos salariales superiores y comprenden las posiciones de gerentes senior, directores, vicepresidentes y presidente de la Compañía Coca-Cola

gastos de combustible, mantenimiento y seguro de dicho carro eran pagados por la Compañía Cadbury. Sin embargo, a partir de la Segunda Relación Laboral, la Compañía Coca-Cola decidió sustituir este carro por una Asignación por Carro, la cual me era pagada mensualmente, para compensar en efectivo, el beneficio de carro de la compañía a que tenía derecho por el nivel gerencial de mi posición.

3.5. Premio de Opción de Compra de Acciones de la Compañía Coca-Cola para reconocer desempeño, por un número específico de tales acciones según cada grado o nivel salarial, con un mínimo y un máximo para reconocer desempeño. Las opciones eran otorgadas por la Compañía Coca-Cola a nivel mundial, y anualmente eran aprobadas por la Junta de Directores de la Compañía Coca-Cola. Estas opciones se basaban en: (i) desempeño del negocio; (ii) desempeño individual; y, (iii) el balance de la compensación total.

4. **Terminación de la Segunda Relación Laboral.**

4.1. La Segunda Relación Laboral con la Compañía Coca-Cola terminó unilateralmente por despido injustificado de ésta, el cual fue efectivo el 30 de junio de 2007.

A la terminación de la Segunda Relación Laboral, la Compañía Coca-Cola procedió a calcular la indemnización por tiempo servido, tomando en cuenta únicamente el tiempo laborado directamente para la Compañía Coca-Cola, no así el tiempo de servicio con la Compañía Cadbury. Tampoco se adicionó el 30% de Ventajas Económicas.

Ante mi requerimiento que: (i) se calculara la indemnización tomando en cuenta el tiempo de servicio con la Compañía Cadbury –según el ofrecimiento de la Compañía Coca-Cola al momento de contratarme– y, (ii) se adicionara las



Ventajas Económicas, la Compañía Cola-Cola procedió a recalcular la indemnización correspondiente, incluyendo mi tiempo de servicio con la Compañía Cadbury y adicionando el 30% de Ventajas Económicas[7].

Sin embargo, en el promedio de los salarios devengados durante los últimos 6 meses de la Segunda Relación Laboral –para efectos de calcular el importe de la indemnización-, no fueron incluidos el Premio Incentivo Anual que me fue pagado en el mes de Marzo de 2007, ni la Asignación por Carro que me fue pagada durante dichos 6 meses, ni la suma recibida por mí en Junio de 2007, al haber ejercitado las Opciones a Compra de Acciones de la Compañía Coca-Cola que me fueron otorgadas, mediante el método que más adelante se relaciona.

Nuevamente solicité a la Compañía Coca-Cola reconsiderar el cálculo de la indemnización, apelando a la excelencia gerencial y al buen juicio de negocios de la Compañía Coca-Cola. Por el contrario, recibí una respuesta negativa y lacónica, en donde me informaban, que procedieron a consignar el monto correspondiente en el Juzgado 5º de Trabajo de la Ciudad de Guatemala[8].

4.2.  En efecto, como se indicó en la última comunicación relacionada en el numeral 4.1 que antecede[9], la Subsidiaria en Guatemala de la Compañía Coca-Cola, procedió a consignar a mi favor ante el Juzgado Quinto de Trabajo y Previsión Social, la suma de Q.2,704,735.37 en concepto de pago de prestaciones laborales e indemnización.

No comparto lo afirmado por la Subsidiaria en Guatemala de la Compañía Coca-Cola en el memorial de consignación, en el sentido que me negué

---

[7] Ver Documentos 4.1.1., 4.1.2, 4.1.3 y 4.1.4
[8] Ver Documentos 4.2.1 y 4.2.2
[9] Ver Documento 4.2.2.

injustificadamente a recibir el pago de las prestaciones a que tenía derecho, pues como ya indiqué antes, no estoy de acuerdo con el cálculo efectuado unilateralmente por la Compañía Coca-Cola, circunstancia que le comuniqué verbal y documentalmente[10]. Sin embargo, aún cuando estuve dispuesto a recibir dicho pago bajo reserva de reclamar cualquier reajuste al cual tengo derecho legalmente, la Compañía Coca-Cola -por su parte- no estaba dispuesta a entregarme el cheque correspondiente si no firmaba antes un finiquito a su favor. Esta era una actitud a esperar de la Compañía Coca-Cola, pues antes de notificarme el despido, condicionó el pago de mi salario, asignación por carro y bonificación-incentivo correspondiente al mes de junio de 2007, a que previamente firmara los recibos de los meses de enero a mayo -que por una omisión de la Compañía Coca-Cola no me fueron presentados para su firma oportunamente-. De ahí que tales recibos fueron firmados por mí en fecha posterior a la indicada por la Compañía Coca-Cola en cada uno de ellos.

Amparado constitucional y legalmente por la naturaleza irrenunciable de mis derechos laborales, procedí a aceptar el monto de Q.2,704,735.37 consignado a mi favor[11].

4.3. Finalmente, mientras recopilaba toda la información y documentación necesaria para preparar la presente demanda, procedí a interrumpir la prescripción ante la Inspección General de Trabajo de conformidad con el artículo 266, literal a) del Código de Trabajo[12].

**5. Condiciones de trabajo.**

---

[10] Ver Documentos 4.1.1, 4.1.2, 4.1.3, 4.1.4 y 4.2.1
[11] Ver Documento 4.3.1
[12] Ver Documentos 4.4.1, 4.4.2, 4.4.3 , 4.4.4, 4.4.5, 4.4.6, 4.4.7 y 4.4.8



Las condiciones de trabajo que regían mi contrato de trabajo o relación laboral con la Compañía Coca-Cola para efectos de las reclamaciones que pretendo por medio de la presente demanda, son:

5.1. <u>Cargo desempeñado.</u> Fui contratado originalmente por la Compañía Coca-Cola como Asistente del Director para Centroamérica teniendo a mi cargo las marcas Schweppes. Durante el último año de la relación ocupé la posición de Director de Area para las marcas Schweppes en Centroamérica, Caribe y Colombia y la marca Seagrams en México.

5.2. <u>Lugar de trabajo.</u> Durante el último año de la relación laboral, desarrollé mis labores para la Compañía Coca-Cola en Centroamérica, Caribe, Colombia y México.

5.3. <u>Jornada de trabajo.</u> Dada la naturaleza de la posición que desempeñé y de las labores desarrolladas no estaba sujeto a las limitaciones de la jornada de trabajo.

5.4. <u>Salario devengado.</u>

5.4.1. *Salario mensual.* El último salario mensual devengado por mí era de Q.108,655.01.

5.4.2. *Salario promedio durante los últimos 6 meses.* Durante los últimos 6 meses de la relación laboral tuve un salario promedio de Q.345,108.44.

5.4.3. *Salario promedio durante el último año.* El promedio de las remuneraciones ordinarias y extraordinarias devengadas por mí durante el último año de la relación laboral es de Q.226,881.73.

5.5. <u>Ventajas económicas.</u>

La Compañía Coca-Cola me otorgaba ventajas económicas que, de acuerdo a sus políticas, estimó en 42.86% sobre el salario promedio mensual devengado

por mí en efectivo, durante los últimos 6 meses de relación laboral (sin incluir el Premio Incentivo Anual, ni la Asignación por Carro ni el Premio de Opción de Compra de Acciones). Dicho porcentaje se desprende del propio cálculo realizado por la Compañía Coca-Cola, el cual fue presentado en la consignación hecha a mi favor[13].

En efecto, el monto de Q.626,404.37 por concepto de ventajas económicas, fue calculado por la Compañía Coca-Cola de conformidad con la siguiente fórmula:

$$\text{Ventajas Económicas} = \frac{Q.96,973.67}{365} \times 5501 \times 42.86\%$$

En donde,

**Q96,973.67** es el salario devengado durante los últimos 6 meses, según el cálculo de la Compañía Coca-Cola (en el que no se incluye el Premio Incentivo Anual, la Asignación por Carro, el Premio de Opción de Compra de Acciones Opción ni la proporcionalidad del aguinaldo y la bonificación anual);

**365** son los días del año calendario;

**5501** son los días trabajados para la Compañía Coca-Cola durante toda la relación laboral; y,

---

[13] Ver Documento 43.1.



**42.86%** es el porcentaje de Ventajas Económicas aplicado por la Compañía Coca-Cola.

De lo anterior se puede concluir que en la consignación presentada a mi favor, la Compañía Coca-Cola no calculó las ventajas económicas utilizando el 30% sobre el monto de la indemnización, ya que si lo hubiera hecho, el resultado sería de Q.438,453.83 y no de Q.626,404.37 tal como fue consignado a mi favor, y que resulta de calcular con un 42.86%.

Sin embargo, es importante señalar que la Compañía Coca-Cola, para efectos de calcular las ventajas económicas, de conformidad con las disposiciones legales aplicables[14], omitió incluir: (i) las remuneraciones devengadas por mí durante los últimos 6 meses de la relación laboral, consistentes en Premio Incentivo Anual, Asignación por Carro y Premio de Opción de Compra de Acciones; y, (ii) la proporcionalidad del aguinaldo y la bonificación anual.

5.6. Inicio y terminación de la relación laboral.

La relación laboral inició el 8 de junio de 1992 y terminó el 30 de junio de 2007 por despido injustificado de la Compañía Coca-Cola.

## III. RECLAMACIONES

Al haber sido despedido injustificadamente –hecho que fue expresamente aceptado por la Subsidiaria en Guatemala de la Compañía Coca-Cola al haber promovido la consignación relacionada en el Apartado II (4.2) de la presente demanda[15]– adquirí el <u>derecho irrenunciable</u> –de conformidad con el artículo 106 de la Constitución Política de la

---

[14] Artículos 82 del Código de Trabajo, 9º del Decreto 76-78 del Congreso de la República (Ley Reguladora de la Prestación del Aguinaldo para los Trabajadores del Sector Privado) y 4 del Decreto 42-92 del Congreso de la República (Ley de Bonificación Anual para Trabajadores del Sector Privado y Público)
[15] Ver Documento 4.3.1

República[16] y los Considerandos[17] del Código de Trabajo- que se me pague: (i) la

---

[16] *"Los derechos consignados en esta sección son **irrenunciables** para los trabajadores, susceptibles de ser superados a través de la contratación individual o colectiva, y en la forma que fija la ley. Para este fin el Estado fomentará y protegerá la negociación colectiva. Serán nulas ipso jure y no obligarán a los trabajadores, aunque se expresen en un contrato colectivo o individual de trabajo, en un convenio o en otro documento, las estipulaciones que impliquen renuncia, disminución, tergiversación o limitación de los derechos reconocidos a favor de los trabajadores en la Constitución, en la ley, en los tratados internacionales ratificados por Guatemala, en los reglamentos u otras disposiciones relativas al trabajo. En caso de duda sobre la interpretación o alcance de las disposiciones legales, reglamentarias o contractuales en materia laboral, **se interpretarán en el sentido más favorable para los trabajadores."***

[17] *"CONSIDERANDO: Que se hace necesario revisar la legislación laboral vigente, a efecto de introducirle las modificaciones que la experiencia ha aconsejado; CONSIDERANDO: Que es conveniente ajustar y precisar los conceptos del Código de Trabajo, con el objeto de acomodarlos a la doctrina y a la técnica jurídica, así como integrarlo con los precedentes de los tribunales del ramo e incorporar al derecho positivo nacional las disposiciones aceptadas por Guatemala, al ratificar diversos convenios internacionales de trabajo; CONSIDERANDO: Que las características ideológicas que deben inspirar la Legislación Laboral, son las siguientes; CONSIDERANDO: Que esas características ideológicas del Derecho de Trabajo y, en consecuencia, también las del Código de Trabajo, por ser éste una concreción de aquél adaptada a la realidad de Guatemala, se puede resumir así: a) **El Derecho de Trabajo es un derecho tutelar de los trabajadores**, puesto que trata de compensar la desigualdad económica de éstos otorgándoles una protección jurídica preferente; b) **El Derecho de Trabajo constituye un mínimun de garantías sociales protectoras del trabajador, irrenunciables únicamente para éste** y llamadas a desarrollarse posteriormente en forma dinámica, en estricta conformidad con las posibilidades de cada empresa patronal, mediante la contratación individual o colectiva y, de manera muy especial, por medio de los pactos colectivos de condiciones de trabajo; c) **El derecho de Trabajo es un derecho necesario e imperativo, o sea, de aplicación forzosa en cuanto a las prestaciones mínimas que conceda la ley**, de donde se deduce que esta rama del Derecho limita bastante el principio de la "autonomía de la voluntad" propio del Derecho Común, el cual supone erróneamente que las partes de todo contrato tienen un libre arbitrio absoluto para perfeccionar un convenio, sin que su voluntad esté condicionada por diversos factores y desigualdades de orden económico-social; d) **El Derecho de Trabajo es un derecho realista y objetivo: lo primero, porque estudia al individuo en su realidad social** y considera que para resolver un caso determinado a base de una bien entendida equidad es indispensable enfocar ante todo la posición económica de las partes, **y lo segundo, porque su tendencia es la de resolver los diversos problemas** que con motivo de su tendencia es la de resolver los diversos problemas que con motivo de su aplicación surjan, con criterio social y a base de hechos concretos y tangibles; e) **El Derecho de Trabajo es una rama del Derecho Público**, por lo que al ocurrir su aplicación, el interés privado debe ceder ante el interés social o colectivo; y f) **El Derecho de Trabajo es un derecho hondamente democrático porque se orienta a obtener la dignificación económica y moral de los trabajadores**, que constituyen la mayoría de la población, realizando así una mayor armonía social, lo que no perjudica, sino que favorece, los intereses justos de los patronos; y porque el Derecho de Trabajo es el antecedente necesario para que impere una efectiva libertad de contratación, que muy pocas veces se ha contemplado en Guatemala, puesto que al limitar la libertad de contratación puramente jurídica que descansa en el falso supuesto de su coincidencia con la libertad económica, impulsa al país fuera de los rumbos legales individualistas; que sólo en teoría postulan la libertad, la igualdad y la fraternidad; CONSIDERANDO: Que para la eficaz aplicación del Código de Trabajo es igualmente necesario introducir radicales reformas a la parte adjetiva de dicho cuerpo de leyes, a fin de expeditar la tramitación de los diversos juicios de trabajo, estableciendo un conjunto de normas procesales claras, sencillas y desprovistas de mayores formalismos, que permitan administrar justicia pronta y cumplida; y que igualmente es necesario regular la actuación de las autoridades administrativas de trabajo para que estas puedan resolver con celeridad y acierto los problemas que surjan con motivo de la aplicación de la legislación laboral; y CONSIDERANDO: Que las*



indemnización por tiempo servido calculada de acuerdo con los artículos 82 y 90 del Código de Trabajo y los artículos 9° del Decreto 76-78 y 4 del Decreto 42-92, ambos del Congreso de la República; (ii) el salario por vacaciones calculado de acuerdo con el artículo 134 del Código de Trabajo; (iii) el aguinaldo y la bonificación anual calculados de acuerdo con la leyes de su creación; y, (iv) en caso, la indemnización por tiempo servido no me sea pagada total e integramente de acuerdo con las referidas disposiciones legales, entonces tengo el <u>derecho irrenunciable</u> de reclamar judicialmente el pago del reajuste y los daños y perjuicios proporcionales al monto no pagado, así como las costas procesales.

Por ello reclamo de las demandadas:

1. **El reajuste de mi indemnización por tiempo servido por la suma de Q.5,607,741.52 incluyendo el 42.86% de Ventajas Económicas.**

   En efecto, debe incluirse en el promedio de los salarios devengados por mí durante los últimos 6 meses de la Segunda Relación Laboral -para calcular el importe de dicha indemnización-, los siguientes rubros:

   1.1. El Premio Incentivo Anual, que me fue pagado en Marzo de 2007, por la suma de Q.499,490.49. Entiendo que la Compañía Coca-Cola se negó a incluir dicha suma en el promedio de salarios para efectos de calcular la indemnización por tiempo servido, pretendiendo considerarla como bonificación incentivo por productividad y eficiencia contemplada por el Decreto 78-89 del Congreso de la República. Sin embargo, el Premio Incentivo Anual que me fue pagado por la Compañía Coca-Cola como parte de mi paquete de compensación o remuneración, no constituye la bonificación-incentivo por productividad y

---

*normas del Código de Trabajo deben inspirarse en el principio de ser esencialmente conciliatorias entre el capital y el trabajo y atender a todos los factores económicos y sociales pertinentes.*

eficiencia a que se refiere el Decreto 78-89 del Congreso de la República, por las siguientes razones:

1.1.1.  En primer lugar, porque el Decreto 78-89 del Congreso de la República creó una bonificación-incentivo para los trabajadores del sector privado en Guatemala. El Premio Incentivo Anual que me fue pagado por la Compañía Coca-Cola, fue establecido por ésta a nivel mundial[18]. Es decir, no deriva del referido Decreto 78-89, pues este mismo Premio Incentivo Anual es pagado por la Compañía Coca-Cola a otros empleados gerenciales en Costa Rica, México y Estados Unidos de América, por citar algunos ejemplos.

1.1.2.  De conformidad con el artículo 2 del Decreto 78-89 del Congreso de la República, la bonificación-incentivo por productividad y eficiencia, requiere forzosamente[19] que sea "convenida en las empresas de mutuo acuerdo y en forma global con los trabajadores y de acuerdo con los sistemas de tal productividad y eficiencia que se establezcan". Es el caso que el Premio Incentivo Anual antes referido, es otorgado por la Compañía Coca-Cola únicamente a los empleados de cierto nivel gerencial (de nivel 10 en adelante)[20]. Es decir no aplica a todos los empleados de la Compañía Coca-Cola.

---

[18] Ver Documento 3.2
[19] *"La bonificación por productividad y eficiencia deberá ser convenida en las empresas de mutuo acuerdo y en forma global con los trabajadores y de acuerdo con los sistemas de tal productividad y eficiencia que se establezcan. Esta bonificación no incrementará el valor del salario para el cálculo de indemnizaciones o compensaciones por tiempo servido, ni aguinaldos, salvo para cómputo de séptimo día, que se computará como salario ordinario. Es gasto deducible para la determinación de la renta imponible del impuesto sobre la renta, en cuanto al trabajador no causará renta imponible afecta. No estará sujeta ni afecta al pago de las cuotas patronales del IGSS, IRTRA e INTECAP, salvo que patronos y trabajadores acuerden pagar dichas cuotas".*
[20] Ver Documentos 3.2 y 3.3



De hecho, durante los años 2001, 2002 y 2003, la Subsidiaria en Guatemala de la Compañía Coca-Cola documenta el pago del Premio Incentivo Anual correspondiente a dichos años, como "bono especial"[21]. Sin embargo, a partir del año 2004 –coincidentemente con el cambio de asesor contable que tenía a su cargo el manejo de la nómina-, empieza a documentar el referido pago del Premio Incentivo Anual, como "complemento bonificación 78-89 / 37-2001" – años 2004 y 2005-[22] y como "Pago del Complemento del Bono Incentivo 78-89" –año 2007-[23]. Estos últimos conceptos no son los que se expresan en las cartas de la Compañía Coca-Cola mediante las cuales me comunicaban oficialmente el otorgamiento del Premio Incentivo Anual[24]. Obviamente, en mi posición de empleado no tenía otra alternativa que firmar los recibos emitidos bajo tales conceptos, pues de lo contrario no me pagaban el Premio Incentivo Anual o incluso podía correr el riesgo de ser despedido.

La única razón entonces que puede inferirse con meridiana claridad, es que la Subsidiaria en Guatemala de la Compañía Coca-Cola –seguramente por consejo de sus asesores contables y fiscales- decidió a partir del año 2004, documentar el pago de los Premios Incentivos Anuales bajo el concepto de "complemento bonificación 78-89 / 37-2001" y "Pago del Complemento del Bono Incentivo 78-89", con la intención de eludir el pago de indemnizaciones por tiempo servido y contribuciones del seguro social que estaba obligada a cubrir.

La documentación del pago de los Premios Incentivos Anuales bajo los conceptos indicados, es nula "ipso jure" de acuerdo con los artículos 106 de la

---

[21] Ver Documentos 5.1.1, 5.1.2, 5.1.3 y 5.1.4
[22] Ver Documentos 5.2.1 y 5.2.2
[23] Ver Documento 5.3.1
[24] Ver Documentos 5.4.1 5.4.2 y 5.4.3

Constitución Política de la República, 4 de la Ley del Organismo Judicial y 12 del Código de Trabajo, y constituye fraude de ley de conformidad con el referido artículo 4 de la Ley del Organismo Judicial.

1.2. La Asignación por Carro de Q.14,505.67 mensuales que me fue pagada durante los meses de enero a junio de 2007. Al igual que el Premio Incentivo Anual referido en el numeral 1.1 que antecede, la Compañía Coca-Cola pretende considerar el pago de la Asignación por Carro, como bonificación incentivo por productividad y eficiencia contemplada por el Decreto 78-89 del Congreso de la República. Ello se deriva del concepto de "Bonific. 78-89 (Gts. Auto)" bajo el cual se documentó dicho pago, a partir de Enero de 2004[25]. Sin embargo, hasta Diciembre de 2003, el pago fue documentado como "Gastos Auto" por la Subsidiaria en Guatemala de la Compañía Coca-Cola[26]. Tal Asignación por Carro –como fue denominada expresamente por la Compañía Coca-Cola[27], no constituye tampoco la bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República, por las siguientes razones:

1.2.1. De la misma manera que el Premio Incentivo Anual, la Asignación por Carro es pagada por la Compañía Coca-Cola a nivel mundial, a todos aquellos empleados que no puede asignarles un carro propiedad de la Compañía y que de acuerdo con su nivel gerencial tendrían derecho a que se les asigne dicho carro.

1.2.2. La Asignación por Carro tampoco ha sido convenida en forma global con los trabajadores y de acuerdo con los sistemas de productividad y

---

[25] Ver Documentos 6.1.1, 6.1.2, 6.1.3, 6.1.4, 6.1.5 y 6.1.6
[26] Ver Documentos 6.2.1, 6.2.2, 6.2.3, 6.2.4, 6.2.5 y 6.2.6
[27] Ver Documento 6.3.1



eficiencia que se establezcan, como lo exige la bonificación-incentivo a que se refiere el Decreto 78-89. Por el contrario, la Asignación por Carro aplica únicamente a empleados de cierto nivel gerencial y se paga mes a mes, independientemente de la productividad y/o eficiencia del empleado.

Cabe entonces deducir –una vez más- la intención de la Compañía de Servicios del Distrito Norte, S. A. de documentar el pago de la referida Asignación por Carro, a partir de Enero de 2004, bajo el concepto de "Bonific. 78-89 (Gts. Auto)", para eludir el pago de indemnizaciones por tiempo servido y contribuciones del seguro social. La documentación del pago de la Asignación por Carro bajo el concepto indicado, debe considerarse también nula "ipso jure" y en fraude de ley.

1.3. El Premio de Opción de Compra de Acciones de la Compañía Coca-Cola que representó una compensación o remuneración en efectivo durante el mes de junio de 2007, por la suma de US$117,000.00 equivalente a Q.902,284.11. Como parte de la compensación a sus empleados, la Compañía Coca-Cola otorga anualmente la Opción de comprar un número específico de sus acciones -según cada grado o nivel salarial- a un precio determinado. La Opción de Compra de Acciones de la Compañía Coca-Cola –según la propia Compañía Coca-Cola[28]- juega un rol clave en la compensación total ya que: (i) promueve la propiedad en la Compañía Coca-Cola; (ii) alienta a los empleados a pensar y actuar como propietarios; y, (iii) vincula la compensación a la creación de valor para el accionista[29]. Se trata de una prestación variable que aplica solamente a

---

[28] Ver Documento 3.2
[29] Ver Documentos 3.2 y 7.1.1

empleados de nivel 10[30] en adelante y que se otorga anualmente, previa aprobación de la Junta de Directores de la Compañía Coca-Cola[31].

De acuerdo con los términos y condiciones del Plan de Opción de Compra de Acciones de la Compañía Coca-Cola:

1.3.1. Una vez otorgado el Premio a cada empleado, debe transcurrir un período de tiempo para que las Opciones a Compra de Acciones de la Compañía Coca-Cola (en adelante las Opciones) puedan hacerse efectivas a través de su ejercicio. Durante ese período de tiempo, las Opciones pueden hacerse efectivas gradualmente, a razón de un 25% cada año, de manera que el 100% se pueden hacer efectivas transcurridos 48 meses (4 años) a partir de su otorgamiento.

1.3.2. Transcurrido el período para hacer efectivas las Opciones, el empleado tiene el derecho de ejercitar las Opciones que le fueron otorgadas, al precio de ejercicio establecido al momento de su otorgamiento. Obviamente, el precio de mercado de las acciones de la Compañía Coca-Cola debe ser mayor al precio de ejercicio de las Opciones, para que se traduzca en una compensación o remuneración para el empleado. El ejercicio de las Opciones se puede hacer a través de cualquiera de los siguientes métodos:

1.3.2.1. **Ejercicio de las Opciones comprando acciones de la Compañía Coca-Cola pagando en efectivo el precio de ejercicio:** bajo este método el empleado adquiere acciones de la Compañía Coca-Cola pagando el precio de ejercicio, por lo

---

[30] Ver Documento 3.1
[31] Ver Documento 3.2



que la compensación o remuneración por las Opciones otorgadas, se traduce en <u>salario en especie:</u> acciones de la Compañía Coca-Cola adquiridas a un precio menor que el precio de mercado.

**1.3.2.2. Ejercicio de las Opciones sin pagar en efectivo el precio de ejercicio:** bajo este método el empleado ejercita las Opciones, por cualquiera de los siguientes tipos de ejercicio:

(i) *Ejercicio de las Opciones adquiriendo acciones de la Compañía Coca-Cola sin pagar en efectivo el precio de ejercicio:* el empleado ejercita las Opciones y al mismo tiempo vende a precio de mercado solamente el número de acciones necesarias para pagar el precio de ejercicio, por lo que la compensación o remuneración por las Opciones otorgadas, se traduce en <u>salario en especie:</u> acciones de la Compañía Coca-Cola adquiridas sin pagar precio alguno y que tienen un precio de mercado mayor al precio de ejercicio.

(ii) *Ejercicio de las Opciones vendiendo acciones de la Compañía Coca-Cola sin pagar en efectivo el precio de ejercicio:* el empleado ejercita las Opciones y al mismo tiempo vende a precio de mercado todas las acciones adquiridas, por lo que la compensación o remuneración por las Opciones otorgadas, se traduce en <u>salario en efectivo:</u> la diferencia entre el precio de mercado al cual vendió las acciones de la Compañía Coca-Cola y el

precio de ejercicio al cual le fueron otorgadas las Opciones.

1.3.2.3. **Ejercicio mediante intercambio:** bajo este método el empleado ejercita las Opciones, vendiendo al precio de mercado un número de acciones de la Compañía Coca-Cola que ya posee, necesarias para pagar el precio de ejercicio, por lo que la compensación o remuneración por las Opciones otorgadas, se traduce en salario en especie: acciones de la Compañía Coca-Cola adquiridas pagando el precio de ejercicio y que tienen un precio de mercado mayor que el precio de ejercicio.

En mi caso, la Compañía Coca-Cola me otorgó a partir del año 1999 y hasta el año 2007, 42,475 Opciones[32], de las cuales podía hacer efectivas 25,503 –a diferentes precios de ejercicio- por haber transcurrido el período de tiempo necesario. En tal sentido, en junio de 2007, ejercité las 25,503 Opciones mediante el método de ejercicio descrito en el numeral 1.3.2.2 (ii) vendiendo todas las acciones de la Compañía Coca-Cola, por lo que el día 26 de ese mes, recibí una compensación o remuneración en efectivo como empleado de la Compañía Coca-Cola, por la suma de US$117,000[33] equivalente a Q.902,284.11 al tipo de cambio de referencia del 26 de junio de 2007, publicado por el Banco de Guatemala.[34]

A continuación el detalle del cálculo de mi indemnización por tiempo servido incluyendo los rubros arriba referidos más el 42.86% de Ventajas Económicas, menos

---

[32] Ver Documentos del 7.2.1 al 7.2.9
[33] Ver Documento 7.3.1
[34] Ver Documento 7.4.1



el pago parcial efectuado como consecuencia de la consignación efectuada a mi favor[35]:

| | Salario Base | Incentivo Anual | Asignación por Carro | Opción de Compra de Acciones | Total Salario Efectivo |
|---|---|---|---|---|---|
| Enero 07 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Febrero 07 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Marzo 07 | 94,149.34 | 499,490.49 | 14,505.67 | | 608,145.50 |
| Abril 07 | 99,798.00 | | 14,505.67 | | 114,303.67 |
| Mayo 07 | 99,798.00 | | 14,505.67 | | 114,303.67 |
| Junio 07 | 99,798.00 | | 14,505.67 | 902,284.11 | 1,016,587.78 |
| Total | 581,842.02 | 499,490.49 | 87,034.02 | 902,284.11 | 2,070,650.64 |
| Total salarios devengados durante los últimos 6 meses | | | | | 2,070,650.64 |
| Promedio de salarios devengados durante los últimos 6 meses | | | | | 345,108.44 |
| Proporcionalidad del Aguinaldo[36] | | | | | 9,289.95 |
| Proporcionalidad de la Bonificación Anual[37] | | | | | 9,289.95 |
| Base de Cálculo para la Indemnización | | | | | 363,688.33 |
| Indemnización por Tiempo Servido durante 5,501 días | | | | | 5,557,359.73 |
| 42.86% de Ventajas Económicas | | | | | 2,381,884.38 |
| **Total Indemnización incluyendo Ventajas Económicas** | | | | | **7,939,244.11** |
| Menos Pago Parcial | | | | | 2,331,502.59 |

---

[35] Ver Documento 4.3.1
[36] Calculado sobre Salario Base + Asignación por Carro
[37] Calculado sobre Salario Base + Asignación por Carro

| Reajuste Indemnización | 5,607,741.52 |
|---|---|

2. **Reajuste de mi salario por vacaciones por la suma de Q.109,288.00.**

Toda vez que: (i) el Premio Incentivo Anual y la Asignación por Carro no constituyen la bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República; y (ii) la Opción de Compra de Acciones de la Compañía Coca-Cola me significó una compensación o remuneración en efectivo por parte de la Compañía Coca-Cola; deben tomarse en cuenta para calcular el salario por vacaciones correspondientes a 43.75 días a que tengo derecho, de acuerdo con el siguiente detalle:

| | Salario Base | Incentivo Anual | Asignación por Carro | Opción a Compra de Acciones | Total Salario Efectivo |
|---|---|---|---|---|---|
| Julio 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Agosto 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Sept. 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Oct. 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Nov. 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Dic. 06 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Enero 07 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Febrero 07 | 94,149.34 | | 14,505.67 | | 108,655.01 |
| Marzo 07 | 94,149.34 | 499,490.49 | 14,505.67 | | 608,145.50 |
| Abril 07 | 99,798.00 | | 14,505.67 | | 114,303.67 |
| Mayo 07 | 99,798.00 | | 14,505.67 | | 114,303.67 |
| Junio 07 | 99,798.00 | | 14,505.67 | 902,284.11 | 1,016,587.78 |



| Total | 1,146,738.06 | 499,490.49 | 174,068.04 | 902,284.11 | 2,722,580.70 |
|---|---|---|---|---|---|
| Promedio Anual | | | | | 226,881.73 |
| Salario Diario | | | | | 7,562.72 |
| Vacaciones por 43.75 días | | | | | 330,869.18 |
| Menos Pago Parcial | | | | | 221,581.18 |
| **Reajuste Vacaciones** | | | | | **109,288.00** |

3.  **Reajuste de mi aguinaldo por la suma de Q.9,321.25.**

Toda vez que la Asignación por Carro no constituye la bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República, debe tomarse en cuenta para calcular el aguinaldo proporcional a 212 días a que tengo derecho, de acuerdo con el siguiente detalle:

| | Salario Base | Asignación por Carro | Total Salario Mensual |
|---|---|---|---|
| Diciembre 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Enero 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Febrero 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Marzo 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Abril 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| Mayo 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| Junio 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| **Total** | **675,991.36** | **101,539.69** | **777,531.05** |
| Promedio Mensual | | | 111,075.86 |
| Aguinaldo por 212 días | | | 65,411.34 |

| Menos Pago Parcial | 56,090.09 |
|---|---|
| **Reajuste** | **9,321.25** |

4. __Reajuste de mi bonificación anual por la suma de Q.14,505.67.__

Toda vez que la Asignación por Carro no constituye la bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República, debe tomarse en cuenta para calcular la bonificación anual a 360 días a que tengo derecho, de acuerdo con el siguiente detalle:

| | Salario Base | Asignación por Carro | Total Salario Mensual |
|---|---|---|---|
| Julio 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Agosto 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Septiembre 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Octubre 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Noviembre 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Diciembre 06 | 94,149.34 | 14,505.67 | 108,655.01 |
| Enero 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Febrero 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Marzo 07 | 94,149.34 | 14,505.67 | 108,655.01 |
| Abril 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| Mayo 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| Junio 07 | 99,798.00 | 14,505.67 | 114,303.67 |
| Total | 1,146,738.06 | 174,068.04 | 1,320,806.10 |
| Promedio Mensual | | | 110,067.18 |



| | | |
|---|---|---|
| Bonificación Anual por 360 días | | 110,067.18 |
| Menos Pago Parcial | | 95,561.51 |
| **Reajuste** | | **14,505.67** |

5. **El 70.63%[38] de los salarios caídos a título de daños y perjuicios.**

   Toda vez que no me fue pagada en su totalidad la indemnización por tiempo servido a que tengo derecho, como consecuencia del despido injustificado por parte de la Compañía Coca-Cola, ésta debe pagarme a título de daños y perjuicios, la parte proporcional al reajuste de mi indemnización por tiempo servido, que equivale al 70.63% de los salarios que dejé de percibir desde el momento del despido hasta el pago del reajuste de la indemnización, hasta un máximo de 12 meses de salario. Para el efecto, deberá tomarse como base el salario promedio de Q.345,108.44 mensuales, devengado por mí durante los últimos 6 meses de la relación laboral.

6. **Las costas judiciales.**

   Finalmente, es procedente reclamar costas judiciales calculadas de conformidad con el Arancel de Abogados, Arbitros, Procuradores, Mandatarios Judiciales, Expertos, Interventores y Depositarios contenido en el Decreto 111-96 del Congreso de la República.

## IV. MEDIOS DE PRUEBA

Para acreditar los hechos relacionados en el Apartado II y las reclamaciones formuladas en el Apartado III, ofrezco los siguientes medios de prueba:

1. **Confesión judicial y reconocimiento de documentos** que deberán prestar las partes demandadas, a través del representante legal que designe cada una, al absolver el pliego de posiciones que presentaré en su oportunidad, bajo apercibimiento de ser declaradas confesas, en su rebeldía.

---

[38] Porcentaje del Reajuste respecto del Total de Indemnización incluyendo Ventajas Económicas

2. **Documentos** que acompaño –con su respectiva traducción jurada al español de aquellos que se encuentran en idioma inglés– consistentes en:

Anexo 1 -documentos relacionados en el Apartado II (1)-:

1.1. Fotocopia simple de la carta de fecha 27 de febrero de 1992, suscrita por Juan Guillermo Echeverri, Gerente Regional de Centro América y Panamá de Coca-Cola Interamerican Corporation.

1.2. Impresión de la página de Internet http://www.bccr.fi.cr/flat/bccr_flat.htm del Banco Central de Costa Rica que contiene el tipo de cambio de compra y de venta del dólar de los Estados Unidos de América en colones costarricenses para el 28 de febrero de 1992.

Anexo 2 -documentos relacionados en el Apartado II (2)-:

2.1. *Sub-Anexo 2.1:*

2.1.1. Fotocopia simple de la carta de fecha 4 de junio de 1992, suscrita por Homero A. Villarreal, Vicepresidente de Recursos Humanos de Cadbury Beverages.

2.2. *Sub-Anexo 2.2:*

2.2.1. Fotocopia simple de la carta de fecha 9 de junio de 1999, suscrita por John Farell de The Coca-Cola Company.

2.2.2. Fotocopia simple de la carta de fecha 17 de junio de 1999, suscrita por M. Douglas Ivester, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

2.2.3. Fotocopia simple del documento titulado Preguntas y Respuestas para los Empleados de Cadbury Schweppes, de fecha 18 de junio de 1999.

2.2.4. Fotocopia simple de la carta de contratación de fecha 9 de julio de 1999, suscrita por Coca-Cola Interamerican Corporation.



Anexo 3 -documentos relacionados en el Apartado II (3)-:

3.1. Fotocopia simple del documento titulado Comparación de la Compensación Total José Romero Asistente del Director para Centroamérica.

3.2. Fotocopia simple del documento titulado Resumen de la Compensación Total de The Coca-Cola Company, de fecha Junio de 1999.

3.3. Fotocopia simple del documento titulado Coca-Cola Sesión Informativa sobre Compensación y Beneficios.

Anexo 4 -documentos relacionados en el Apartado II (4)-:

4.1. *Sub-Anexo 4.1:*

4.1.1. Fotocopia simple de la impresión de correo electrónico de fecha 7 de junio de de 2007, enviado a Miguel Angel Luna.

4.1.2. Fotocopia simple de la impresión de la cadena de correos electrónicos, que inicia con el correo electrónico de fecha 7 de junio de 2007, enviado por Miguel Angel Luna y finaliza con el correo electrónico de fecha 8 de junio de 2007, enviado por Miguel Angel Luna.

4.1.3. Fotocopia simple de la impresión de correo electrónico de fecha 12 de junio de 2007, enviado a Miguel Angel Luna.

4.1.4. Fotocopia simple del telefax de fecha 11 de junio de 2007, enviado a Miguel Angel Luna.

4.2. *Sub-Anexo 4.2:*

4.2.1. Fotocopia simple de la carta de fecha 30 de julio de 2007, dirigida a Xiemar Zarazúa, Presidente de FTZ Coca-Cola Industrias, S. A.

4.2.2. Fotocopia simple de la carta de fecha 3 de agosto de 2007, suscrita por Xiemar Zarazúa, Presidente de Coca-Cola Latin Center Division.

4.3. *Sub-Anexo 4.3:*

4.3.1. Fotocopia simple del Incidente de Consignación número L1-2007-2572 a cargo del Oficial 4°, tramitado ante el Juzgado 5° de Trabajo y Previsión Social.

4.4. *Sub-Anexo 4.4:*

4.4.1. Memorial presentado ante la Inspección General de Trabajo el 8 de agosto de 2007.

4.4.2. Resolución dictada por la Inspección General de Trabajo el 8 de agosto de 2007.

4.4.3. Memorial presentado ante la Inspección General de Trabajo el 18 de septiembre de 2007.

4.4.4. Resolución dictada por la Inspección General de Trabajo el 18 de septiembre de 2007.

4.4.5. Memorial presentado ante la Inspección General de Trabajo el 29 de octubre de 2007.

4.4.6. Resolución dictada por la Inspección General de Trabajo el 29 de octubre de 2007.

4.4.7. Memorial presentado ante la Inspección General de Trabajo el 10 de diciembre de 2007.

4.4.8. Resolución dictada por la Inspección General de Trabajo el 10 de diciembre de 2007.

Anexo 5 -documentos relacionados en el Apartado III (1) (1.1)-:

5.1. *Sub-Anexo 5.1:*

5.1.1. Recibo fechado 31 de enero de 2001, en concepto de Bono Especial por la suma de Q.80,758.00.

5.1.2. Recibo fechado 31 de marzo de 2001, en concepto de Bono Especial por



la suma de Q.108,500.38.

5.1.3. Recibo fechado 8 de abril de 2002, en concepto de Bono Especial por la suma de Q.125,715.00.

5.1.4. Recibo fechado 14 de marzo de 2003, en concepto de Bono Especial correspondiente al período 2002 por la suma de Q.226,270.30.

5.2. *Sub-Anexo 5.2:*

5.2.1. Recibo fechado 16 de marzo de 2004, en concepto de complemento bonificación 78-89 / 37-2001 por la suma de Q.200,250.59.

5.2.2. Recibo fechado 15 de marzo de 2005, en concepto de complemento bonificación 78-89 / 37-2001 por la suma de Q.278,630.79.

5.3. *Sub-Anexo 5.3:*

5.3.1. Fotocopia simple del recibo fechado 15 de marzo de 2007, en concepto de pago de complemento del Bono Incentivo 78-89 del año 2007 por la suma de Q.499,490.49.

5.4. *Sub-Anexo 5.4:*

5.4.1. Fotocopia simple de la carta de fecha 9 de agosto de 2000, suscrita por W. E. (Chris) Lowe, Presidente de Coca-Cola Interamerican Corporation, División Centroamericana y del Caribe.

5.4.2. Fotocopia simple de la carta de fecha 6 de marzo de 2002, suscrita por José Octavio Reyes L., Presidente de Coca-Cola División Norte de Latinoamérica.

5.4.3. Fotocopia simple de la carta de fecha 15 de marzo de 2002, suscrita Douglas N. Daft, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

Anexo 6 -documentos relacionados en el Apartado III (1) (1.2)-:

6.1. *Sub-Anexo 6.1:*

    6.1.1. Recibo sin fecha en concepto de sueldo correspondiente del 01/01/2004 al 31/01/2004 por la suma de Q.83,980.67.

    6.1.2. Recibo fechado 25 de febrero de 2004, en concepto de sueldo correspondiente del 01/02/2004 al 29/02/2004 por la suma de Q.83,980.67.

    6.1.3. Recibo fechado 25 de febrero de 2004, en concepto de sueldo correspondiente del 01/03/2004 al 31/03/2004 por la suma de Q.83,980.67.

    6.1.4. Recibo fechado 25 de abril de 2004, en concepto de sueldo correspondiente del 01/04/2004 al 30/04/2004 por la suma de Q.94,364.42.

    6.1.5. Recibo fechado 25 de mayo de 2004, en concepto de sueldo correspondiente del 01/05/2004 al 31/05/2004 por la suma de Q.94,364.42.

    6.1.6. Recibo fechado 25 de junio de 2004, en concepto de sueldo correspondiente del 01/06/2004 al 30/06/2004 por la suma de Q.94,364.42.

6.2. *Sub-Anexo 6.2:*

    6.2.1. Recibo fechado 31 de julio de 2003, en concepto de bonificación del mes de Julio de 2003 Gastos Auto por la suma de Q.14,505.67.

    6.2.2. Recibo fechado 30 de agosto de 2003, en concepto de bonificación del mes de Agosto de 2003 Gastos Auto por la suma de Q.14,505.67.

    6.2.3. Recibo fechado 30 de septiembre de 2003, en concepto de bonificación del mes de Septiembre de 2003 Gastos Auto por la suma de Q.14,



505.67.

6.2.4. Recibo fechado 31 de octubre de 2003, en concepto de bonificación del mes de Octubre de 2003 Gastos Auto por la suma de Q.14, 505.67.

6.2.5. Recibo fechado 30 de noviembre de 2003, en concepto de bonificación del mes de Noviembre de 2003 Gastos Auto por la suma de Q.14,505.67.

6.2.6. Recibo fechado 31 de diciembre de 2003, en concepto de bonificación del mes de Diciembre de 2003 Gastos Auto por la suma de Q.14,505.67.

6.3. Sub-Anexo 6.3:

6.3.1. Fotocopia simple del memorando de fecha 19 de junio de 2000, suscrito por William B. Cole.

Anexo 7 -documentos relacionados en el Apartado III (1) (1.3)-:

7.1. Sub-Anexo 7.1:

7.1.1. Folleto titulado Programa de Opción de Compra de Acciones de The Coca-Cola Company.

7.2. Sub-Anexo 7.2:

7.2.1. Fotocopia simple de la carta de fecha 21 de octubre de 1999, suscrita por M. Douglas Ivester, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

7.2.2. Fotocopia simple de la carta de fecha 23 de octubre de 2000, suscrita por Douglas N. Daft, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

7.2.3. Fotocopia simple de la carta de fecha 18 de diciembre de 2002, suscrita por Douglas N. Daft, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

7.2.4. Fotocopia simple de la carta de fecha 5 de enero de 2004, suscrita por Douglas N. Daft, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

7.2.5. Fotocopia simple de la carta de fecha 29 de enero de 2004, suscrita por Daniel H. Sayre, Presidente Coca-Cola Latin Center Division.

7.2.6. Fotocopia simple de la carta de fecha 1 de diciembre de 2005, suscrita por E. Neville Isdell, Presidente de la Junta Directiva y Presidente Ejecutivo de The Coca-Cola Company.

7.2.7. Fotocopia simple de la carta de fecha 10 de enero de 2006, suscrita por señor José Luis Carmona.

7.2.8. Fotocopia simple del estado de cuenta de adjudicación de opción de compra de acciones comprendido el 1 de enero al 31 de diciembre de 2006.

7.2.9. Fotocopia simple del fax enviado por Merrill Lynch de fecha 19 de junio de 2007.

7.3. *Sub-Anexo 7.3:*

7.3.1. Fotocopia simple de la carta de fecha 8 de julio de 2007, suscrita por Aurora González, Merrill Lynch.

7.4. *Sub-Anexo 7.4:*

7.4.1. Impresión de la página de Internet http://www.banguat.gob.gt/cambio/historico.asp?ktipo=3&kdia=26&kmes=06&kanio=2007&submit1=Consultar del Banco de Guatemala que contiene tipo de cambio de dólares de los Estados Unidos de América, para el 26 de junio de 2007.

3. **Documentos que deberán exhibir las partes demandadas** en la primera audiencia,



consistentes en:

3.1. Copia de la carta de contratación de fecha 9 de julio de 1999, suscrita por Coca-Cola Interamerican Corporation, con la firma original de aceptada por mi persona.

3.2. Contrato individual de trabajo celebrado con mi persona, el cual deberá estar debidamente sellado por el Departamento de Registro Laboral de la Dirección General de Trabajo.

3.3. Recibos originales de pago de mi salario mensual y demás prestaciones laborales correspondientes al último año de la relación laboral.

4. **Exhibición del libro de salarios** de Compañía de Servicios del Distrito Norte, S. A., correspondiente al período del 1 de enero de 1999 al 30 de junio de 2007, para determinar los siguientes puntos:

1. Que el libro de salarios se encuentra debidamente autorizado y sellado por el Departamento Nacional del Salario de la Dirección General de Trabajo.

2. Si aparecen registrados pagos extraordinarios anuales a mi favor bajo el concepto de bono especial, durante el período del 1 de junio de 1999 al 31 de diciembre de 2003.

3. Si aparecen registrados pagos extraordinarios anuales a mi favor bajo el concepto de complemento bonificación 78-89 / 37-2001, durante el período del 1 de enero de 2004 al 31 de diciembre de 2006.

4. Si aparece registrado un pago extraordinario anual a mi favor bajo el concepto de complemento del bono incentivo 78-89, durante el período del 1 de enero al 30 de junio de 2007.

5. Si los pagos extraordinarios anuales fueron realizados únicamente a algunos empleados que aparecen en el libro de salarios, durante el período del 1 de

enero de 1999 al 30 de junio de 2007.

6. Si aparece registrado un pago mensual de Q.14,505.87 a mi favor bajo el concepto de bonificación gastos auto, durante el período del 1 de junio de 1999 al 31 de diciembre de 2003.

7. Si aparece registrado un pago mensual de Q.14,505.87 a mi favor bajo el concepto de bonificación 78-89 (Gts. Auto), durante el período del 1 de enero de 2004 al 30 de junio de 2007.

8. Si los pagos mensuales de Q.14,505.87 fueron realizados a la totalidad de empleados que aparecen en el libro de salarios, durante el período del 1 de enero de 1999 al 30 de junio de 2007.

**5. Informes que deberán pedirse a:**

The Coca-Cola Company en el lugar que señale para recibir notificaciones, sobre los siguientes puntos:

1. La cantidad de Opciones de Compra de Acciones de The Coca-Cola Company que me fueron otorgadas hasta el 31 de mayo de 2007.

2. La cantidad de Opciones de Compra de Acciones de The Coca-Cola Company que me fueron otorgadas y que podía ejercitar al 18 de junio de 2007.

3. La suma en efectivo que fue depositada en mi cuenta, como consecuencia de haber ejercitado las Opciones de Compra de Acciones de The Coca-Cola Company en Junio de 2007.

Proyección Ocupacional, S. A. en 24 avenida 21-74 zona 6, Proyectos 4-10, de esta ciudad, sobre los siguientes puntos:

1. Si Proyección Ocupacional, S. A. presta servicios de personal a The Coca-Cola Company, y/o FTZ Coca-Cola Industrias, S. A. y/o Compañía de Servicios del Distrito Norte, S. A.

2. Si el personal que Proyección Ocupacional, S. A. proporciona a The Coca-Cola Company, y/o FTZ Coca-Cola Industrias, S. A. y/o Compañía de Servicios del Distrito Norte, S. A. presta sus servicios en las oficinas de Compañía de Servicios del Distrito Norte, S. A., situadas en Avenida de las Américas 18-81 zona 14, Edificio Columbus Center, Nivel 11, Oficina 11 Norte, de esta ciudad.

3. Si al personal que Proyección Ocupacional, S. A. proporciona a The Coca-Cola Company, y/o FTZ Coca-Cola Industrias, S. A. y/o Compañía de Servicios del Distrito Norte, S. A., se le efectúa un pago extraordinario anual bajo el concepto de complemento del bono incentivo 78-89.

4. Si al personal que Proyección Ocupacional, S. A. proporciona a The Coca-Cola Company, y/o FTZ Coca-Cola Industrias, S. A. y/o Compañía de Servicios del Distrito Norte, S. A., se le efectúa un pago mensual de Q.250.00 bajo el concepto de bonificación-incentivo.

5. Si al personal que Proyección Ocupacional, S. A. proporciona a The Coca-Cola Company, y/o FTZ Coca-Cola Industrias, S. A. y/o Compañía de Servicios del Distrito Norte, S. A., además de la bonificación-incentivo Q.250.00 mensuales relacionada en el numeral 4 que antecede, se le efectúa un pago mensual bajo el concepto de bonificación 78-89 (Gts. Auto).

6. **Dictamen de expertos sobre el libro de salarios** de Compañía de Servicios del Distrito Norte, S. A., correspondiente al período del 1 de enero de 1999 al 30 de junio de 2007, que deberá versar sobre los puntos y por el experto que oportunamente propondré.

7. **Declaración testimonial,** que deberán prestar las siguientes personas:

   *Héctor Gabriel Aguilar García,* quien puede ser citado en *3ª avenida 38-33 zona 12, de esta ciudad,* de conformidad con el siguiente interrogatorio:

1. Nombre, apellidos, edad, estado, nacionalidad, profesión y domicilio.

2. Si es pariente de alguno de los litigantes y en qué grado.

3. Si tiene interés directo o indirecto en el pleito o en otro semejante.

4. Si es amigo íntimo o enemigo de alguno de los litigantes.

5. Si es trabajador doméstico, dependiente, acreedor o deudor de alguno de los litigantes, o si tiene algún otro género de relación con ellos.

6. Diga el testigo si prestó sus servicios profesionales a la Compañía de Servicios del Distrito Norte, S. A.

7. Diga el testigo cuándo prestó sus servicios profesionales a la Compañía de Servicios del Distrito Norte, S. A.

8. Diga el testigo en que consistían los servicios prestados a la Compañía de Servicios del Distrito Norte, S. A.

9. Diga el testigo si durante el tiempo que prestó sus servicios, el pago del Premio Incentivo Anual que efectuaba la Compañía de Servicios del Distrito Norte, S. A. a sus empleados fue registrado en el libro de salarios bajo el concepto de bono especial.

10. Diga el testigo si el Premio Incentivo Anual o bono especial era pagado a todos los empleados que figuraban en la nómina de la Compañía de Servicios del Distrito Norte, S. A.

11. Diga el testigo si tiene conocimiento que la Compañía de Servicios del Distrito Norte, S. A. haya acordado con todos sus empleados el pago del Premio Incentivo Anual o bono especial como bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República.

12. Diga el testigo si durante el tiempo que prestó sus servicios, el pago de la Asignación Por Carro que efectuaba la Compañía de Servicios del Distrito Norte,



S. A. a sus empleados fue registrado en el libro de salarios bajo el concepto de gastos auto.

13. Diga el testigo si la Asignación por Carro o gastos auto era pagado a todos los empleados que figuraban en la nómina de la Compañía de Servicios del Distrito Norte, S. A.

14. Diga el testigo si tiene conocimiento que la Compañía de Servicios del Distrito Norte, S. A. haya acordado con todos sus empleados el pago de la Asignación por Carro o gastos auto como bonificación-incentivo por productividad y eficiencia a que se refiere el Decreto 78-89 del Congreso de la República.

15. Diga el testigo la razón del conocimiento de los hechos.

Eddie Gregory Sime Mayorga, quien puede ser citado en *Del Parque Las Chorreras San Rafael de Heredia, 2300 metros Norte y 250 metros Este, Heredia, República de Costa Rica*, de conformidad con el siguiente interrogatorio:

1. Nombre, apellidos, edad, estado, nacionalidad, profesión y domicilio.

2. Si es pariente de alguno de los litigantes y en qué grado.

3. Si tiene interés directo o indirecto en el pleito o en otro semejante.

4. Si es amigo íntimo o enemigo de alguno de los litigantes.

5. Si es trabajador doméstico, dependiente, acreedor o deudor de alguno de los litigantes, o si tiene algún otro género de relación con ellos.

6. Diga el testigo si trabajó para The Coca-Cola Company.

7. Diga el testigo cuándo trabajó para The Coca-Cola Company.

8. Diga el testigo en que países trabajó para The Coca-Cola Company.

9. Diga el testigo cuáles fueron los distintos niveles que tuvo en The Coca-Cola Company.

10. Diga el testigo si The Coca-Cola Company le pagaba cada año un Premio

Incentivo Anual.

11.  Diga el testigo si dicho Premio Incentivo Anual formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

12.  Diga el testigo si The Coca-Cola Company le asigna un carro o vehículo propiedad de dicha compañía a empleados de cierto nivel gerencial.

13.  Diga el testigo si The Coca-Cola Company le asignaba un carro o vehículo propiedad de dicha compañía.

14.  Diga el testigo si dicho carro o vehículo formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

15.  Diga el testigo si The Coca-Cola Company le otorgaba un Premio de Opción de Compra de Acciones de la Compañía Coca-Cola cada año.

16.  Diga el testigo si dicho Premio de Opción de Compra de Acciones de la Compañía Coca-Cola formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

17.  Diga el testigo la razón del conocimiento de los hechos.

Paul Gerard Thompson, quien puede ser citado en 25 Hampton Drive, Kohimarama, Auckland 1071, Nueva Zelanda, de conformidad con el siguiente interrogatorio:

1.  Nombre, apellidos, edad, estado, nacionalidad, profesión y domicilio.

2.  Si es pariente de alguno de los litigantes y en qué grado.

3.  Si tiene interés directo o indirecto en el pleito o en otro semejante.

4.  Si es amigo íntimo o enemigo de alguno de los litigantes.

5.  Si es trabajador doméstico, dependiente, acreedor o deudor de alguno de los litigantes, o si tiene algún otro género de relación con ellos.

6.  Diga el testigo si trabajó para The Coca-Cola Company.

7.  Diga el testigo cuándo trabajó para The Coca-Cola Company.

8.   Diga el testigo en que países trabajó para The Coca-Cola Company.

9.   Diga el testigo cuáles fueron los distintos niveles que tuvo en The Coca-Cola Company.

10.   Diga el testigo si The Coca-Cola Company le pagaba cada año un Premio Incentivo Anual.

11.   Diga el testigo si dicho Premio Incentivo Anual formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

12.   Diga el testigo si The Coca-Cola Company le asigna un carro o vehículo propiedad de dicha compañía a empleados de cierto nivel gerencial.

13.   Diga el testigo si The Coca-Cola Company le asignaba un carro o vehículo propiedad de dicha compañía.

14.   Diga el testigo si dicho carro o vehículo formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

15.   Diga el testigo si The Coca-Cola Company le otorgaba un Premio de Opción de Compra de Acciones de la Compañía Coca-Cola cada año.

16.   Diga el testigo si dicho Premio de Opción de Compra de Acciones de la Compañía Coca-Cola formaba parte de su paquete de compensación como empleado de The Coca-Cola Company.

17.   Diga el testigo la razón del conocimiento de los hechos.

8. **Presunciones legales y humanas** que de los hechos probados se deriven.

### V. NOTIFICACIÓN Y RECEPCIÓN DE PRUEBAS EN EL EXTRANJERO

1. <u>Notificación a la Compañía Coca-Cola.</u>

1.1. Tal y como lo preceptúa el artículo 327 del Código de Trabajo, toda resolución debe hacerse saber a las partes o a sus representantes facultados para el efecto, en la forma legal establecida, para que puedan quedar obligadas.

1.2. En virtud que una de las demandadas -The Coca-Cola Company- tiene su domicilio en Atlanta, Georgia, Estados Unidos de América, y toda vez que Guatemala y los Estados Unidos de América son Estados Partes de la Convención Interamericana sobre Exhortos o Cartas Rogatorias del 30 de enero de 1975 (en adelante la Convención)[39] y su Protocolo Adicional del 8 de mayo de 1987 (en adelante el Protocolo)[40], es procedente notificar la presente demanda y citar a The Coca-Cola Company mediante exhorto o carta rogatoria de conformidad con la Convención y su Protocolo Adicional.

2. **Declaración de testigos en el extranjero.**

2.1. Como consta en el Apartado VI (5) de la presente demanda, para acreditar los hechos en que se funda la misma, ofrecí la declaración testimonial de dos personas que residen en el extranjero: una en Costa Rica y otra en Nueva Zelanda.

2.2. Toda vez que:

2.2.1. Guatemala y Costa Rica son Estados Partes de la Convención Interamericana sobre Recepción de Pruebas en el Extranjero del 30 de enero de 1975 (en adelante la Convención)[41], es procedente recibir la declaración testimonial del señor Eddie Gregory Sime Mayorga ante juez

---

[39] Aprobada por Guatemala mediante Decreto 10-80 del Congreso de la República, ratificada el 4 de marzo de 1980 y depositado el instrumento el 8 de mayo de 1980.
[40] Aprobado por Guatemala mediante Decreto 83-87 del Congreso de la República, ratificado el 6 de enero de 1988 y depositado el instrumento el 26 de febrero de 1988.
[41] Aprobada por Guatemala mediante Decreto 64-79 del Congreso de la República, ratificada el 24 de octubre de 1979 y depositado el instrumento el 17 de diciembre de 1979.



competente de su domicilio, conforme al interrogatorio presentado y represuntas si las hubiera, librándose para el efecto exhorto o carta rogatoria de conformidad con la Convención.

2.2.2. No existe convención multilateral o bilateral para la recepción de pruebas en el extranjero de la que Guatemala y Nueva Zelanda sean Estados Parte, es procedente recibir la declaración testimonio del señor Paul Gerard Thompson ante juez competente de su domicilio, conforme al interrogatorio presentado y repreguntas si las hubiera, librándose para el efecto suplicatorio dirigido por medio del Presidente de la Corte Suprema de Justicia, de conformidad con el artículo 115 de la Ley del Organismo Judicial.

2.3. En consecuencia, de conformidad con el artículo 349 del Código de Trabajo, después de contestada la demanda y con audiencia de las partes demandadas, deberá librarse el exhorto y suplicatorio respectivos, facultando al juez competente del Estado requerido, para que señale día y hora en que deba recibir la declaración solicitándole que notifique al juez del Estado requirente mediante exhorto telegráfico con por lo menos 3 días de anticipación más el término de la distancia.

## VI. EMBARGO PRECAUTORIO

### 1. Consideraciones sobre las medidas precautorias.

Las medidas precautorias o cautelares, como también se conocen, son las adoptadas para asegurar que un fallo pueda ser eficaz. El autor español Valentín Cortés Domínguez[42], indica que el derecho a la cautela o al aseguramiento de la

---

[42] Cortés Domínguez, Valentín. **Derecho Procesal.** Tomo I, Pág. 469. España, Editorial Tirant Lo Blanch. 1988.

tutela plena de las sentencias, es un derecho procesal siendo, en definitiva, un derecho de frente al Estado por el que pedimos se asegure la plena efectividad de la futura sentencia de condena durante el tiempo que se tarde en tramitar el procedimiento.

Son pues, las medidas precautorias o cautelares, herramientas puestas a disposición de la justicia, para asegurar que la aplicación de la ley trascenderá las gestiones puramente formales del proceso, garantizando los resultados materiales de los fallos judiciales, y con ello, la eficacia en su aplicación, como sustento del orden público y bastión del bien común.

2. **Necesidad de la medida precautoria de embargo.**

En el presente caso, es pertinente asegurar el derecho que me asiste, mediante una medida precautoria de embargo, en virtud que una de las demandadas -The Coca-Cola Company- no se encuentra establecida legalmente en Guatemala, por lo que puede sustraerse fácilmente o impedir la ejecución en su jurisdicción, de un eventual fallo condenatorio en su contra, haciéndolo ineficaz.

Dada la cuantía de las reclamaciones que pretendo a través de la presente demanda, es procedente embargar algunas de las marcas Coca-Cola, que son los únicos bienes propiedad de The Coca-Cola Company en Guatemala.

Por lo anteriormente expuesto, formulo la siguiente

## VII. PETICIÓN

**De trámite.**

1. Que con el presente memorial y documentos adjuntos se inicie la formación del expediente respectivo.

2. Se tome nota de la asesoría bajo las que actúo y del lugar señalado para recibir notificaciones, así como del lugar donde pueden ser notificadas las partes



demandadas.

3. Se admita para su trámite la presente demanda ordinaria laboral en contra de **The Coca-Cola Company y Compañía de Servicios del Distrito Norte, Sociedad Anónima.**

4. Se dicte como medida precautoria el embargo de las siguientes marcas propiedad de The Coca-Cola Company, inscritas en el Registro de la Propiedad Intelectual, librando para el efecto los oficios respectivos:

    4.1. Número 52077, folio 459 del tomo 115 de Marcas.

    4.2. Número 124701, folio 68 del tomo 274 de Marcas.

    4.3. Número 23573, folio 257 del tomo 62 de Marcas.

5. Se fije el plazo por razón de la distancia en 30 días.

6. Se libre exhorto o carta rogatoria de conformidad con la Convención Interamericana sobre Exhortos o Cartas Rogatorias del 30 de enero de 1975 y su Protocolo Adicional del 8 de mayo de 1987, para notificar a The Coca-Cola Company en el lugar señalado para el efecto.

7. Tomando en cuenta el plazo por razón de la distancia, se señale día y hora para que las partes comparezcan a juicio oral, previniéndoles presentarse con sus pruebas, a efecto de que las rindan en dicha audiencia, bajo apercibimiento de continuar el juicio en rebeldía de la parte que no compareciera en tiempo, sin más citarle ni oírle.

8. Se tengan por ofrecidos los medios de prueba debidamente individualizados en el apartado respectivo.

9. Se cite a las entidades The Coca-Cola Company y Compañía de Servicios del Distrito Norte, Sociedad Anónima para que presten confesión judicial y reconocimiento de documentos en la primera audiencia, por medio del representante legal que designe cada una para el efecto, al absolver el pliego de posiciones que presentaré en su

oportunidad, bajo apercibimiento de ser declaradas confesas y tener por reconocido los documentos, en su rebeldía.

10. Se ordene a las entidades demandadas para que exhiban los documentos individualizados en el Apartado IV (3) de la presente demanda, en la primera audiencia, conminándoseles con una multa de Q.50 a Q.500.00 por cada documento, en caso de desobediencia, sin perjuicio de presumirse ciertos los datos aducidos por mi persona.

11. Se ordene a Compañía de Servicios del Distrito Norte, S. A. para que exhiba el libro de salarios individualizado en el Apartado IV (4) de la presente demanda, en la primera audiencia, conminándosele con una multa de Q.50 a Q.500.00 en caso de desobediencia, sin perjuicio de presumirse ciertos los datos aducidos por mi persona.

12. Se libren oficios solicitando los informes individualizados en el Apartado IV (5) de la presente demanda, fijando un plazo para informar, bajo apercibimiento de certificar lo conducente por el delito de desobediencia.

13. Se cite al señor Héctor Gabriel Aguilar García, a través de la Policía Nacional Civil, en la 3ª avenida 38-33 zona 12, de esta ciudad, para que preste **declaración testimonial**, en la primera audiencia, quien depondrá de conformidad con el interrogatorio individualizado en el Apartado IV (6), conminándosele con multa de Q.5.00 a Q.25.00, en caso de desobediencia.

14. Después de contestada la demanda y con audiencia de las partes demandadas, deberá librarse el exhorto y suplicatorio respectivos, para recibir la declaración testimonial de los señores Eddie Gregory Sime Mayorga y Paul Gerard Thompson, quienes depondrán de conformidad con los interrogatorios individualizados en el Apartado IV (6) y repreguntas si las hubiere, facultando al juez competente de cada Estado requerido, para que señale día y hora en que deba recibir la declaración



solicitándole que notifique al juez del Estado requirente mediante exhorto telegráfico con por lo menos 3 días de anticipación más el término de la distancia

**De sentencia.**

Oportunamente se dicte sentencia, declarando con lugar la presente demanda ordinaria laboral promovida en contra de **The Coca-Cola Company** y **Compañía de Servicios del Distrito Norte, Sociedad Anónima** condenándosele al pago de las siguientes reclamaciones:

1. Reajuste de mi indemnización por tiempo servido por la suma de Q.5,607,741.52 incluyendo el 42.86% de Ventajas Económicas.

2. Reajuste de mi salario por vacaciones por la suma de Q.109,288.00.

3. Reajuste de mi aguinaldo por la suma de Q.9,321.25.

4. Reajuste de mi bonificación anual por la suma de Q.14,505.67.

5. A título de daños y perjuicios, la parte proporcional al reajuste de mi indemnización por tiempo servido, que equivale al 70.63% de los salarios que dejé de percibir desde el momento del despido hasta el pago del reajuste de la indemnización, hasta un máximo de 12 meses de salario.

6. Las costas judiciales.

Acompaño duplicado y cuatro copias del presente memorial y documentos adjuntos.

Guatemala, 17 de diciembre de 2007.